******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

JOHN BORG ET AL. *v.* LYNNE CLOUTIER
(AC 41693)

DiPentima, C. J., and Keller and Bright, Js.*

*Syllabus*

The plaintiffs, J, A and their minor child, sought to recover damages from the defendant for trespass, nuisance and invasion of privacy, and the defendant filed a counterclaim against J and A alleging claims of trespass, private nuisance, invasion of privacy, defamation and defamation per se in connection with an ongoing dispute between the parties, who are neighbors. Following prior litigation between the parties and in response to vandalism in the parties' neighborhood, the defendant installed surveillance cameras on the rear of her property, facing the backyard of the plaintiffs' property, which upset J and A because, inter alia, they believed that the cameras were angled to monitor their child's play area. Soon thereafter, J and A installed floodlights in their backyard that emitted bright light into the defendant's yard and through her windows, and the defendant discovered a website connected to J that contained references that she was associated with child pornography. Following a trial, the jury returned a verdict in favor of the defendant on the complaint and on the counterclaim and awarded $292,000 in noneconomic damages against both J and A on the private nuisance and intrusion on seclusion invasion of privacy claims, and $250,000 as to both the defamation claim and false light invasion of privacy claim against J. The jury also found that the actions of J and A were sufficiently reckless or intentional to justify an award of punitive damages. Thereafter, the court denied the motion to set aside the verdict filed by J and A, awarded the defendant $32,600 in punitive damages and ordered a permanent injunction against J and A, limiting their use of the floodlights directed at the defendant's property and requiring J to remove the defamatory statements about the defendant from the website. The court subsequently granted the defendant's motion for contempt, finding J and A in contempt for failing to comply with its permanent injunction order. On J and A's amended appeal to this court, *held*:

1. J and A's claim that the trial court abused its discretion in failing to set aside the verdict because it failed to inquire adequately into possible juror misconduct was unavailing: J and A waived their claim that that court should have conducted an evidentiary hearing on the issue of possible juror misconduct, as they assented to the court's decision to proceed with the trial without conducting further inquiry after its preliminary inquiry into the issue; moreover, under the circumstances, the court properly limited the scope of its investigation of possible juror misconduct, it conducted a sufficient inquiry into the issue and its conclusion as to the absence of juror misconduct was adequately supported by the record.

2. J and A could not prevail on their claim that the trial court abused its discretion in denying the motion to set aside the verdict on the count alleging private nuisance against A and the jury's finding of recklessness, as there was sufficient evidence in the record to support the jury's verdict as to A; contrary to J and A's contention that A could not be liable for private nuisance because there was no direct evidence of her participation in the circumstances that led to the private nuisance claim, the jury was free to infer, on the basis of the circumstantial evidence before it, that A maintained sufficient control and responsibility regarding the activities on the subject premises to find her liable, and the jury was presented with evidence depicting a number of instances from which it could infer that A participated in the creation of the private nuisance intentionally and with a reckless disregard for the rights of the defendant.

3. J and A could not prevail on their claim that the trial court abused its discretion in denying the motion to set aside the verdict because there was insufficient evidence to support the jury's verdict on the counts alleging defamation and false light invasion of privacy against J and its finding of actual malice:

a. There was sufficient evidence on which the jury reasonably could have concluded that J's actions in connection with the website constituted defamation, as the ample evidence linking J to the creation and maintenance of the website was sufficient to permit the jury reasonably to infer that he had registered the website domain name using a credit card and that he posted the statements about the defendant that the jury determined to be defamatory.

b. There was sufficient evidence to support the verdict on the claim of false light invasion of privacy as to J, as the jury reasonably could have concluded that the false light into which the defendant had been placed, as an alleged child pornographer, would be highly offensive to a reasonable person and that J created and maintained the website that published this accusation with knowledge that it was false for the purpose of antagonizing the defendant by misrepresenting her character.

c. There was sufficient evidence for the jury reasonably to find that J acted with actual malice in publishing the defamatory statements about the defendant on the website, as the jury reasonably could have concluded, on the basis of the ongoing hostile relationship between the parties, J and A's refusal to discuss the defendant's concerns about the floodlights and J and A's call to the police when the defendant put a letter in their mailbox, that the website had been created solely to attack the defendant in her role as J and A's adversary.

4. The trial court abused its discretion in refusing to set aside the verdict on the ground that jury awarded double damages to the defendant; although the awards of $292,000 against both J and A for the private nuisance and intrusion on seclusion invasion of privacy claims related to the lights did not constitute duplicative damages, the awards of $250,000 as to both the defamation and false light invasion of privacy claims against J related to the website were duplicative, and, therefore, the court should have set aside the verdict on that ground.

5. J and A could not prevail on their claim that the trial court improperly awarded punitive damages to the defendant: J and A's contention that that court was required hold an evidentiary hearing, sua sponte, on punitive damages was unavailing, and the court's award of $32,600 in punitive damages to the defendant was well within its broad discretion; moreover, this court declined to review the J and A's argument that the trial court should have submitted to the jury the issue of the amount of punitive damages rather than resolving that issue itself, as J and A could not complain on appeal that the court's bifurcation of the punitive damages determination, to which they agreed at trial, entitled them to relief.

6. The trial court correctly determined that a permanent injunction was warranted; because that court's memorandum of decision fully addressed J and A's claim on appeal, this court adopted it as the proper statement of the facts and applicable law on this issue.

7. The trial court properly held J in contempt for failing to comply with its permanent injunction order requiring him to take down the website that contained the defamatory statements about the defendant; that order was sufficiently clear and unambiguous to support a finding of contempt, the record was unequivocally clear that J did not comply with the order and J failed to prove that his failure to comply was not wilful.

Argued March 5—officially released September 15, 2020

*Procedural History*

Action to recover damages for, inter alia, trespass, and for other relief, brought to the Superior Court in the judicial district of Hartford and transferred to the judicial district of Stamford-Norwalk, where the defendant filed a counterclaim; thereafter, the matter was tried to the jury before *Povodator, J.*; verdict for the defendant on the complaint and on the counterclaim; subsequently, the court, *Povodator, J.*, denied the motion to set aside the verdict filed by the named plaintiff et al., granted the motion for remittitur filed by the named plaintiff et al. and rendered judgment for the defendant, from which the named plaintiff et al. appealed to this court; thereafter, the court, *Hon. Ken-*

*neth B. Povodator*, judge trial referee, granted the defendant's motion to modify a temporary injunction and ordered certain permanent injunctive relief, and the named plaintiff et al. filed an amended appeal; subsequently, the court, *Hon. Kenneth B. Povodator*, judge trial referee, granted the defendant's motion for contempt, and the named plaintiff et al. filed an amended appeal. *Reversed in part*; *judgment directed*.

*Christopher G. Winans*, for the appellants (plaintiffs).

*Brian M. Paice*, with whom were *Raymond M. Gauvreau* and, on the brief, *Tara Racicot* and *Peter Sabellico*, for the appellee (defendant).

*Opinion*

KELLER, J. The underlying action is the latest chapter in a long-running dispute between neighbors. The plaintiffs John Borg and Alison Borg[1] brought several causes of action sounding in trespass, private nuisance, and invasion of privacy against the defendant, Lynne Cloutier. In a counterclaim, the defendant brought several causes of action against either one or both of the plaintiffs sounding in trespass, private nuisance, invasion of privacy, defamation and defamation per se, relating to the plaintiffs' allegedly directing flood lights at the defendant's residence for extended periods of time and for allegedly publishing a website containing defamatory statements about the defendant.[2] Following a trial, the jury returned a verdict in favor of the defendant on the complaint and on the counterclaim, and the court denied the plaintiff's motion to set aside the verdict, awarded the defendant common-law punitive damages and ordered a permanent injunction against the plaintiffs, limiting their use of the lights directed at the defendant's property and requiring John Borg to remove the defamatory statements about the defendant from the website. The court thereafter held both plaintiffs in contempt for not complying with the permanent injunction as to the lights and held John Borg in contempt for violating the terms of the injunction as to the website. On appeal, the plaintiffs claim that the court erred in (1) denying their motion to set aside the verdict in favor of the defendant on her counterclaim, (2) awarding punitive damages to the defendant, (3) granting the permanent injunction against John Borg regarding the website, and (4) holding John Borg in contempt with respect to the website containing defamatory statements about the defendant.[3] For the reasons set forth herein, we affirm in part and reverse in part the judgment of the trial court.

The court, in its well reasoned and thorough memorandum of decision on the plaintiffs' motion to set aside the verdict on the defendant's counterclaim, set forth the following facts and procedural history. "This is a lawsuit arising from a neighbor dispute. The plaintiffs and the defendant live in Westport, in an area of town where the houses are relatively small and in relatively close proximity to each other. The parties' properties generally back up to each other, with the rear property line essentially straddled by a ten feet wide right-of-way (approximately five feet from the centerline of the right-of-way encumbering each side's fee interest). The defendant is a relatively longtime resident of her home, and is the owner of the home. The plaintiffs . . . began occupying the property several years before this dispute arose. The nominal owner of the property on which the plaintiffs reside is a trust, established by [Alison Borg's] family.

"This dispute[4] involves [a complaint and a counter-

claim with mutual claims of trespass, private nuisance, and invasion of privacy (seclusion)], with additional claims by the defendant against [John Borg] based on defamation and invasion of privacy (false light)." (Footnotes added and omitted.)

We now set forth additional facts, which the jury reasonably could have found. The defendant is a retired woman in her seventies who lives by herself in Westport. In the fall of 2015, following prior litigation between the parties; see footnote 4 of this opinion; and in response to recent vandalism in the neighborhood in which she and the plaintiffs live, the defendant installed surveillance cameras on the rear of her property, facing the backyard of the plaintiffs' property. The plaintiffs were upset by the defendant's installation of the cameras because they believed that the cameras were angled to monitor their minor child's play area and because they used their property to see clients and patients of their psychotherapy practice. The plaintiffs insisted that the defendant remove the cameras. The defendant made efforts to have the camera angles adjusted.

Not long after, the plaintiffs installed floodlights in their backyard that emitted bright light into the defendant's yard and through her windows at all hours of the day and night. Unable to sleep due to the bright lights, the defendant attempted to communicate her concerns about the lights with the plaintiffs on a number of occasions through different intermediaries but received no response from the plaintiffs. On one occasion, the defendant opened the plaintiffs' mailbox to put a handwritten letter inside it expressing her concerns, and the police thereafter were notified that the defendant had improperly and illegally opened the plaintiffs' mailbox.

In addition, the defendant discovered the existence of a website that contains the headline, "[The defendant] . . . [watches] kiddies," and lists the defendant's address in connection with accusations that she installed her surveillance cameras to observe "a child's playground area and the backyard of neighbor's property who were involved in the recent litigation," and, further, lists the defendant's name in connection with a harassment and child pornography case file pending in the Stamford Superior Court, thereby insinuating that the defendant had an interest in child pornography.[5] The website also lists the contact number for the Department of Children and Families and contains photographs of the defendant's property and cameras. The website does not identify its owner or any of its contributors.

The court's memorandum of decision lays out the following additional procedural history. "[T]he plaintiffs initially sued the defendant, and the named plaintiffs included [John Borg and Alison] Borg, as well as

their daughter. The [counterclaim] filed by the defendant, nominally directed to all of the plaintiffs, [was] clearly directed only to [John Borg and Alison Borg] (arguably belatedly acknowledged by the defendant at or around the time of trial).

"As presented to the jury, the claims of the plaintiffs were based on theories of private nuisance, invasion of privacy (right of seclusion), and trespass. As presented to the jury, the claims of the defendant directed to the . . . plaintiffs were reciprocal theories, i.e., private nuisance, invasion of privacy (right of seclusion) and as to [John] Borg only, trespass. There were additional claims of defamation and invasion of privacy (false light), directed only to [John] Borg.

"On January 24, 2018, after a trial that lasted approximately [three] weeks, the jury found for the defendant as to all of the plaintiffs' claims (including that of the minor plaintiff). The jury also found for the defendant with respect to all of her claims against the . . . plaintiffs, awarding $146,000 in noneconomic damages as against each plaintiff for each of the claims of private nuisance and invasion of privacy (right of seclusion) and $10 of nominal damages as to [John] Borg with respect to the trespass claim. As to the defamation and invasion of privacy (false light) claims, the jury awarded the defendant $250,000 on each claim directed to [John] Borg. The jury also found that the defendant had proven that the plaintiffs had acted sufficiently recklessly or intentionally as to justify an award of common-law punitive damages." (Footnote omitted.)

On March 2, 2018, after the court accepted the jury verdict, the plaintiffs filed a motion to set aside the verdict and for remittitur. On that same day, the defendant filed a motion to set the amount of the punitive damages award. The court conducted a hearing on the proper amount of punitive damages and, by way of memorandum of decision, awarded the defendant $32,600 in the form of attorney's fees. On May 8, 2018, after a hearing that took place on April 2, 2018, the court denied the plaintiffs' motion to set aside the verdict after carefully considering the several grounds raised therein, and it granted a remittitur in the amount of $292,000,[6] which was accepted by the defendant as to a portion of the damages. On April 20, 2018, the defendant filed a motion to modify a temporary injunction that had been in place since prior to the trial, asking the court to award permanent injunctive relief regarding both the lights and the website. The court granted the requested permanent injunctive relief, over the plaintiffs' objection, after an evidentiary hearing. The permanent injunction ordered by the court required, inter alia, that both plaintiffs refrain from using any outside light at the rear of their property in excess of a specified lumen output threshold, and that John Borg remove or take steps to ensure the removal of the website and its

postings. Thereafter, the defendant moved to hold in contempt the plaintiffs for failing to comply with the permanent injunction order, which the court granted. This appeal, which has been amended twice, followed.

We will address each of the plaintiffs' claims in turn. Additional facts and procedural history will be set forth as necessary.

I

MOTION TO SET ASIDE THE VERDICT

The plaintiffs claim first that the court erred in denying their motion to set aside the verdict in favor of the defendant on her counterclaim. Specifically, they assert that the court abused its discretion in failing to set aside the verdict on the grounds that (1) the court failed to investigate the possibility of juror misconduct and its effect on the verdict, (2) the evidence of Alison Borg's liability for nuisance was insufficient, (3) the evidence of Alison Borg's recklessness was insufficient, (4) the jury awarded double damages to the defendant, (5) the evidence presented on the false light claim asserted against John Borg was insufficient, (6) the evidence presented on the defamation claim asserted against John Borg was insufficient, and (7) the evidence presented on the actual malice claim against John Borg was insufficient. Each of these grounds was raised in the motion and rejected by the court. For purposes of judicial economy, although not necessarily in this order, we will address the juror misconduct and double damages claims independently, and will address together the various claims relating to the insufficiency of evidence, grouped by the particular plaintiff to whom they pertain.

Before we address the plaintiffs' claims as they relate to the court's denial of the motion to set aside the verdict, we first set forth our standard of review. "The standard of review governing our review of a trial court's denial of a motion to set aside the verdict is well settled. The trial court possesses inherent power to set aside a jury verdict [that], in the court's opinion, is against the law or the evidence. . . . [The trial court] should not set aside a verdict [when] it is apparent that there was some evidence [on] which the jury might reasonably reach [its] conclusion, and should not refuse to set it aside [when] the manifest injustice of the verdict is so plain and palpable as clearly to denote that some mistake was made by the jury in the application of legal principles. . . . Ultimately, [t]he decision to set aside a verdict entails the exercise of a broad legal discretion . . . that, in the absence of clear abuse, we shall not disturb." (Internal quotation marks omitted.) *R.I. Pools, Inc.* v. *Paramount Concrete, Inc.*, 149 Conn. App. 839, 847, 89 A.3d 993, cert. denied, 312 Conn. 920, 94 A.3d 1200 (2014).

A

### Failure to Investigate Alleged Juror Misconduct

The plaintiffs claim that the court failed to inquire adequately into possible juror misconduct when a juror—who had been dismissed after the first day of deliberations and replaced by an alternate juror—made a remark while in the presence of the court clerk, outside of the courtroom and the presence of the other jurors, about his opinion that he was " 'uncomfortable' " with John Borg and that he was " 'creepy.' "[7] The plaintiffs, citing *Connecticut Light & Power Co.* v. *Gilmore*, 289 Conn. 88, 104, 956 A.2d 1145 (2008), specifically argue that the court should have granted their request for an evidentiary hearing on whether the juror's "misbehavior [was] such to make it probable that the juror's mind was influenced by it so as to render him or her an unfair and prejudicial juror," and that, in denying such request for an evidentiary hearing, the court abused its discretion. The defendant counters that the court made a sufficient inquiry into the possibility of juror misconduct and, further, that the plaintiffs have waived this claim. We agree with the defendant.

The following additional undisputed facts, as set forth in the court's memorandum of decision on the plaintiffs' motion to set aside the verdict, and procedural history are relevant to our resolution of the plaintiffs' claim. "When the jury commenced deliberations, the parties and court were aware that one of the jurors would not be able to return the following day if the jury did not render verdicts on the complaint and [counterclaim] on that first day of deliberations. At the end of the day, as the court was releasing the jury for the day, the court acknowledged that one juror was unable to return the following day, and released/discharged that particular juror. A few minutes later, the clerk reported to the court that as that discharged juror was leaving—separate and apart from the other jurors—he made an unflattering comment concerning [John] Borg, something along the lines of [John] Borg being 'creepy.' Counsel were apprised of this interchange and in open court were given an opportunity to ask the clerk questions about the circumstances under which she had heard that comment. [The clerk] confirmed that the discharged juror had been separated from the remaining jurors when he made that comment.

"The court already had charged the jury that it should not allow its decision to be swayed by likes and dislikes, particularly since at least some of the parties could fit into somewhat stereotypical personas—the defendant could come across as a prototypical grandmother and the minor plaintiff (testifying with a stuffed animal in her lap) coming across as a prototypical cute little girl. The court also was aware that there were claims that [John] Borg had been responsible for a website associating the defendant with child pornography (specifically identifying the defendant and one of her neighbors by

name, immediately followed by the phrase 'Think Child Porn'), which could have an impact beyond relevance to the merits of the claims of defamation and invasion of privacy (false light).

"The court explained to the parties that it intended to give an additional/curative instruction, not referencing the comment of the discharged juror, but reemphasizing that the jury was to determine the merits of the claims based on the evidence, and not on whether they liked or disliked any of the parties. The court gave counsel an opportunity to comment and make suggestions, and the parties agreed that the court's proposed course of action was appropriate. No one, and especially the plaintiffs, suggested that the court take more aggressive action such as making inquiries of the remaining jurors, something that the court had identified as a possibility but expressed a preference not to do so as to avoid unduly emphasizing the question of the likeability of the parties.

"Although the plaintiffs had agreed to the course of action proposed by the court—and the court followed through as it had proposed without any exception or objection from any party—after the jury returned its verdicts in favor of the defendant as to both the complaint and [counterclaim] the plaintiffs raised the issue of juror misconduct as warranting setting aside the verdict based on this incident."

The court, in analyzing the impact, if any, of the dismissed juror's comment, then stated the following: "The plaintiffs must contend with at least two impediments to relief. The court exercised its discretion in fashioning an appropriate response to a situation that unexpectedly arose. (Technically, it did not actually involve the jury itself but rather a former juror.) Additionally, the plaintiffs agreed to the course of action proposed by the court. Therefore, the plaintiffs must establish not only an abuse of discretion in the action taken, and a likelihood to taint the deliberation process, but they must also negate their waiver of any complaint about the course of action followed by the court. The court outlined its planned course of action, the plaintiffs were given an opportunity for input, and the plaintiffs did not object to the course of action proposed and actually taken by the court. To the extent that the plaintiffs are claiming that the excessiveness of the verdict in favor of the defendant is indicative of a pervasive negative attitude of the jury as directed to the plaintiffs, that is possibly a factor with respect to evaluation of the claim that the verdict was excessive. The plaintiffs have not provided any authority, however, that after agreeing to, or at least acquiescing in, a procedure adopted by the court, a party may retroactively complain about the procedure because the verdict was perceived to be excessive without anything more. . . .

"The court must emphasize that the comment was

made after all of the evidence had been presented and the jury had begun deliberating—in any case in which a party engaged in actionable or criminal conduct, once the jury begins deliberating, the jury will be reaching implicit if not explicit conclusions relating to the character of the actions of parties, and often the egregiousness of that conduct. In civil cases, the issue of recklessness or malice often is an explicit determination, and in this case, the jury was instructed that it was to make those determinations in connection with the evaluation of the conduct of the parties (recklessness as to all parties against whom a claim had been asserted; malice as a possible issue in the claim of defamation). The ultimate issue is not whether the jury (or individual jurors) liked or disliked a party; the issue is whether there was a fair and impartial determination of the merits, and there is no basis for concluding that the plaintiffs did not have a fair and impartial determination of the merits of the claims they were making and the claims asserted against them, based on the statement by a former juror that one of the plaintiffs was creepy.

"The court took appropriate prophylactic/curative action, and other than pointing to the claimed excessive nature of the verdict, the plaintiffs can point to nothing indicating impropriety by the jury. With respect to the claim that excessiveness of the verdict confirms some prejudice against [John] Borg, the actual verdict largely belies such a claim. The defendant pursued a trespass claim against [John] Borg; the jury recognized that the only evidence of a trespass by [John] Borg established a relatively trivial invasion of the defendant's property, and therefore awarded only nominal damages as would be appropriate for a relatively innocuous trespass ($10). That nominal award reflects that the jury was able to (and did) follow the court's instructions, even if there had been an undercurrent of dislike for him; the jury did not allow any collateral emotional attitudes to distort their analysis of an appropriate level of damages." (Footnote omitted.)

On appeal, the plaintiffs claim that the court should have conducted an evidentiary hearing because, "[a]bsent an inquiry as to [the juror's] relationship to his fellow jurors, the stain of prejudice and unfairness soils these proceedings and calls into question the fairness and propriety of the jury's verdict." The plaintiffs failed to object to the court's course of action in the trial court, and the record reflects that they acquiesced in the court's conduct. Thus, we conclude that they have waived their right to raise this claim. "Generally, [w]hen a party consents to or expresses satisfaction with an issue at trial, claims arising from that issue are deemed waived and may not be reviewed on appeal." (Internal quotation marks omitted.) *State* v. *Bharrat*, 129 Conn. App. 1, 35, 20 A.3d 9, cert. denied, 302 Conn. 905, 23 A.3d 1243 (2011). As previously discussed, the plaintiffs declined the opportunity to object to the

court's decision to proceed without questioning each juror individually. Only after the verdict was returned did the plaintiffs allege impropriety in the court's action and claim that the court should have conducted an evidentiary hearing. Having considered all of the relevant circumstances, we conclude that the plaintiffs assented to the court's decision to proceed without conducting further inquiry into the possibility of juror impropriety.

Even if we were to conclude that the plaintiffs had not waived this claim, we conclude that the trial court did not abuse its discretion in choosing not to conduct an evidentiary hearing on the issue of possible juror impropriety.

"To ensure that the jury will decide the case free from external influences that might interfere with the exercise of deliberate and unbiased judgment . . . a trial court is required to conduct a preliminary inquiry, on the record, whenever it is presented with information tending to indicate the possibility of juror misconduct or partiality. . . .

"Any assessment of the form and scope of the inquiry that a trial court must undertake when it is presented with allegations [or the possibility] of jury [bias or] misconduct will necessarily be fact specific. . . . We [therefore] have limited our role, on appeal, to a consideration of whether the trial court's review of alleged [or possible] jury misconduct can fairly be characterized as an abuse of its discretion. . . . Although we recognize that trial [c]ourts face a delicate and complex task whenever they undertake to investigate [the possibility] of juror misconduct or bias . . . we nevertheless have reserved the right to find an abuse of discretion in the highly unusual case in which such an abuse has occurred. . . . Ultimately, however, [t]o succeed on a claim of [juror] bias the [plaintiffs] must raise [their] contention of bias from the realm of speculation to the realm of fact. . . .

"Consequently, the trial court has wide latitude in fashioning the proper response to allegations [or the possibility] of juror bias. . . . [W]hen . . . the trial court is in no way responsible for the [possible] juror misconduct [or bias], the [plaintiffs bear] the burden of proving that the misconduct [or bias] actually occurred and resulted in actual prejudice. . . .

"[W]here the [plaintiffs claim] that the court failed to conduct an adequate inquiry into possible juror bias or prejudice, the [plaintiffs bear] the burden of proving that such bias or prejudice existed, and [they] also [bear] the burden of establishing the prejudicial impact thereof." (Internal quotation marks omitted.) *State* v. *Osimanti*, 111 Conn. App. 700, 714–15, 962 A.2d 129 (2008), aff'd, 299 Conn. 1, 6 A.3d 790 (2010).

In this instance, the record reveals that the court

conducted a sufficient inquiry. Upon learning of the juror's comment, the court permitted counsel for both parties to question the clerk who had heard the remark. The court provided a curative instruction to the jury, reminding the jurors that they must not base their determinations on their personal opinions of either party but, rather, on the merits of each claim and the evidence presented. Most significantly, the court presented counsel with the opportunity to comment and make suggestions as to the proposed course of action. Neither party objected to the court's plan to not conduct an evidentiary hearing or question individual jurors regarding the juror's comment. In fact, the plaintiffs' counsel admitted that doing so could cause more problems than it would solve and chose not to proceed with individual juror questioning. It was only after the verdict was returned, in their motion to set aside the verdict, that the plaintiffs raised for the first time the claim of juror misconduct. The plaintiffs cite no case law in support of the notion that a plaintiff can allege juror misconduct, having not raised it previously, solely on the basis of the amount of the jury verdict.

Additionally, there is no duty imposed on the court to conduct an evidentiary hearing on a claim of juror misconduct. See *Harrison* v. *Hamzi*, 77 Conn. App. 510, 521–22, 823 A.2d 446, cert. denied, 266 Conn. 905, 832 A.2d 69 (2003). When a court's inquiry is adequate and the court has found the absence of any juror impropriety, the defendant has failed to establish juror bias. See *State* v. *Osimanti*, supra, 111 Conn. App. 716. In this instance, we find no fault with the court's conclusion that the statement of the dismissed juror—outside of the presence of the other jurors—that he found John Borg " 'creepy' " did not constitute juror impropriety nor did it prejudice the plaintiffs. Under this circumstance, therefore, the plaintiffs failed to demonstrate that juror misconduct likely occurred and resulted in actual prejudice to them. See id., 714–15. We conclude, therefore, that even if the plaintiffs did not waive their right to claim that the court erred by failing to hold an evidentiary hearing, the court did not abuse its discretion by limiting the scope of its investigation of alleged juror misconduct, and the court's conclusion regarding the absence of juror misconduct finds adequate support in the record.

## B

### Insufficiency of Evidence Relating to Claims Directed at Alison Borg

The plaintiffs next claim that, because there was insufficient evidence to support the jury's finding against Alison Borg on the count alleging private nuisance and its finding of recklessness, the trial court abused its discretion by refusing to set aside the verdict. More specifically, with regard to the nuisance claim, the plaintiffs argue that Alison Borg "had nothing what-

soever to do with the offending lights save for living in the home where they were installed (by [John Borg])" and that "her liability was proverbially 'guilt by association.' " With regard to the finding of recklessness, the plaintiffs argue that "[a]rtificial illumination can hardly be classified as extreme . . . or dangerous" and that Alison Borg's conduct did not constitute recklessness. We disagree.

In reviewing claims of insufficient evidence, we are mindful that "[the trial court] should not set aside a verdict where it is apparent that there was some evidence upon which the jury might reasonably reach [its] conclusion . . . ." (Internal quotation marks omitted.) *Salaman* v. *Waterbury*, 246 Conn. 298, 304, 717 A.2d 161 (1998). Our review of the relevant transcript and exhibits, viewed in the light most favorable to sustaining the verdict; see *Gregorio* v. *Naugatuck*, 89 Conn. App. 147, 157, 871 A.2d 1087 (2005); reveals that there was sufficient evidence to support the jury's verdict against Alison Borg.

With regard to the count alleging private nuisance, the jury reasonably could have found that Alison Borg's control over her premises as the primary occupant of the home made her tortiously liable for private nuisance. In assessing the plaintiffs' claim, the court laid out the following facts that, based on our own review, were supported by evidence. "Although not owned in a title sense by either of the . . . plaintiffs, the property on which they lived was their Connecticut residence— especially, Alison Borg . . . and also was the location of the professional office for [Alison] Borg. (There was some evidence that [John] Borg also used the home for some of his professional pursuits.) Title to the property was in a trust, established by [Alison] Borg's parents, with her mother being identified, at times, as . . . the trustee. On a number of occasions, the defendant tried to communicate with the plaintiffs concerning her complaints about the lights shining on her property, directly and through an intermediary . . . . On one occasion, the [defendant] placed a letter in the plaintiffs' mailbox . . . only to have the police called by the plaintiffs about the claimed unauthorized opening of their mailbox. (Although the plaintiffs deny receiving the letter, the jury could have credited the defendant's testimony that she placed it in the mailbox, and the jury could have rejected the plaintiffs' contention that they never received it—the letter was addressed to [John Borg] and [Alison] Borg.) There were numerous messages (in evidence) sent to the [plaintiffs] . . . relating to the lights and seeking at least an opportunity to discuss the problem, such that the jury could have inferred that [Alison] Borg was well aware of the problem and effectively opted for continuation of the objectionable status quo.

"The jury also was well aware that this was an ongo-

ing battle between neighbors, and that it was not simply [John] Borg and the defendant. [Alison Borg's] family . . . had created the trust, and the trust was the title owner of the property that had been the actual litigant in the prior dispute concerning the proper location of the right-of-way. There was no evidence that [John] Borg had overridden the wishes of [Alison] Borg, and it is a reasonable inference that she knew where the outside lights were focused; at a minimum, she acquiesced in targeting the defendant. (Certainly after the counterclaim had been filed, and after the temporary injunction hearing, there could be no credible claim that she was unaware of the defendant's claim that the lights were perceived by the defendant to be a serious intrusion and an interference with her ability to use and enjoy her property.)

"Somewhat more technically, in her counterclaim, the defendant asserted that '[t]he plaintiffs John Borg and/or Alison Borg erected two large floodlights on their property, that are turned on at all times of the day and evening, that shine into the defendant's entire home, including her bedroom.' In their answer, the plaintiffs stated: 'Admitted as to the existence of lights; the balance of the allegations are denied. [The plaintiffs' daughter] is nine years old.' Thus, although there was no generic reference to 'the plaintiffs' in paragraph [ten of the counterclaim], the answer to this paragraph took pains to . . . identify their daughter . . . separately from the [plaintiffs] . . . . In other words, an effort was made to distinguish individual plaintiffs, when appropriate . . . . No such distinction was made as to Alison Borg.

"Indeed, going somewhat further in this technical vein, [paragraph one] of the counterclaim alleged that all three plaintiffs resided at 5 Sterling Drive in Westport; the answer denied that status as to [John] Borg (also constituting another instance . . . to the effect that the plaintiffs differentiated among the plaintiffs in their answer, as they deemed appropriate). Therefore, according to the plaintiffs, the only adult who (admittedly) resided at the subject location was Alison Borg. Although the jury may not have been aware of the technical details of the pleadings, the pleadings indicate an equal if not more than equal role in the property, and in that sense confirms the jury verdict against [Alison] Borg. [Accordingly] the jury could have concluded that [John] Borg's involvement with the Westport property was somehow secondary to his primary residence elsewhere—leaving [Alison] Borg in primary control. . . .

"Therefore, in terms of relationship to the technical owner, in terms of admitted residency at the Westport address, and in terms of seemingly being at least an equal if perhaps somewhat passive participant with respect to dealing with [the defendant], the jury could

have concluded that [Alison] Borg's control over the premises, which would include the objectionable lighting, made her tortiously liable for the installation and persistence of the lighting as a private nuisance and invasion of privacy (seclusion)." (Footnotes omitted; internal quotation marks omitted.)

The plaintiffs' argument on appeal—namely, that Alison Borg cannot be liable for private nuisance because there is no direct evidence of her participation in the circumstances that the led to the nuisance claim—must fail. Indisputably, the jury was presented with evidence that Alison Borg at least had equal or greater than equal control over their premises as John Borg. The jury also was aware that the family of Alison Borg owns the premises in trust and had participated in the prior action between these parties regarding the boundary line of the property. Accordingly, the jury was free to infer, on the basis of the circumstantial evidence before it, that Alison Borg maintained sufficient control and responsibility regarding the activities on the premises to find her liable in private nuisance, and the court did not err in leaving undisturbed the jury verdict on this count.

Regarding the finding of recklessness underpinning the punitive damages awarded against Alison Borg, the jury reasonably could have found that Alison Borg's actions were sufficiently intentional and, therefore, wilful; see *Elliott* v. *Waterbury*, 245 Conn. 385, 415, 715 A.2d 27 (1998); to justify such an award. In considering this claim, the court laid out the following facts, which we conclude, based on our review of the record, were supported by the evidence. "The jury was well aware of the feud-like relationship between the parties. The jury could have credited the defendant's testimony that she repeatedly tried to contact the plaintiffs to discuss her concerns about lighting, both directly and through an intermediary, all to no avail. The jury was aware that this lawsuit had been pending for a period of time, such that [Alison] Borg clearly knew about the defendant's complaints, with nothing done to attempt to ameliorate the problems (other than by court order). The fact that when [the defendant] had put a letter in their mailbox, inviting the plaintiffs to discuss these problems, the police were called by the plaintiffs, all could lead to an inference of recklessness if not affirmative malice."

"Recklessness is a state of consciousness with reference to the consequences of one's acts. . . . It is more than negligence, more than gross negligence. . . . The state of mind amounting to recklessness may be inferred from conduct. But, in order to infer it, there must be something more than a failure to exercise a reasonable degree of watchfulness to avoid danger to others or to take reasonable precautions to avoid injury to them. . . . Wanton misconduct is reckless miscon-

duct. . . . It is such conduct as indicates a reckless disregard of the just rights or safety of others or of the consequences of the action. . . . Whether the [plaintiff] acted recklessly is a question of fact subject to the clearly erroneous standard of review." (Citation omitted; internal quotation marks omitted.) *Franc* v. *Bethel Holding Co.*, 73 Conn. App. 114, 137–38, 807 A.2d 519, cert. granted on other grounds, 262 Conn. 923, 812 A.2d 864 (2002) (appeal withdrawn October 21, 2003).

The jury was presented with evidence depicting a number of instances from which it could infer that Alison Borg participated in the creation of a private nuisance intentionally and with reckless disregard for the rights of the defendant. For example, the jury heard evidence regarding multiple occasions on which the defendant tried to resolve the problems between herself and the plaintiffs outside of court but was met with both silence and, later, with a call made to the police. Additionally, the history between the parties, of which the jury was made well aware, further underscores the court's determination that the evidence in support of recklessness on the part of Alison Borg was not insufficient.

On the basis of those subordinate facts, we conclude that there was sufficient evidence to support the jury's verdict and that the trial court did not abuse its discretion in declining to set aside the verdict against Alison Borg.

C

### Insufficiency of Evidence Relating to Claims Directed at John Borg

The plaintiffs next claim that, because there was insufficient evidence to support the jury's finding against John Borg on the counts alleging defamation and false light invasion of privacy, and its finding of actual malice, the trial court improperly refused to set aside the verdict. We disagree.

1

### Defamation

With regard to the counts alleging defamation per se and defamation; see footnote 2 of this opinion; the jury reasonably could have found that John Borg's actions connected to the website posting constituted defamation. "[T]o establish a prima facie case of defamation at common law, the plaintiff must prove that (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement." (Internal quotation marks omitted.) *Silano* v. *Cooney*, 189 Conn. App. 235, 241, 207 A.3d 84 (2019). The plaintiffs' claim on appeal, as well as in their motion to set aside the verdict on this

count, pertains only to the sufficiency of the evidence regarding whether John Borg is the person responsible for the website posting. The plaintiffs do not challenge the other elements of defamation, and, accordingly, we need not address them.

The jury was presented with the following evidence, as was succinctly described by the court in its memorandum of decision: "Delving into the website content, personal and localized information—unlikely to be known or available to people outside the immediate area—was incorporated into the content of the various pages, including a video (generated during the earlier litigation) and photos taken from the right-of-way, if not on a property abutting the right-of-way. The website was registered in common with numerous other websites that specifically identified the properties in the area, with the notable exception of the plaintiffs' property address. Much of the content relates to the ongoing skirmishes and battles in this relatively limited area. Some of the links and pages adopt positions from the perspective of the plaintiffs, e.g., references to a civil rights lawsuit commenced by the plaintiffs against the Westport police, and separate reference to a minor whose rights were being violated. After the litigation was started, websites relating to the defendant's attorneys also were created (passing mention made during the trial).

"Although there was no smoking gun, the defendant retained forensic experts [who] were able to establish that the company that had registered the various domain names was one with which [John] Borg had been associated a few years earlier. [John] Borg was listed on the documentation on file with the Secretary of the State relating to that entity, as having various roles with the company, but [John] Borg insisted that his involvement with that company had been highly limited and had terminated years ago. A forensic expert was able to link the payment for registration of some of the relevant domain names with the business entity account—but using a company card that specifically had been issued to [John] Borg."

The court then analyzed the jury's verdict, in light of the evidence, as follows: "As with all aspects of the plaintiffs' motion, the court must view the evidence in a light most favorable to sustaining the verdict which in this instance requires the court to determine whether the circumstantial evidence identified above, in aggregate, was a sufficient basis for the jury to determine that [John] Borg was in fact responsible for the offending website and its contents. . . .

"Viewing the evidence in a manner most favorable to sustaining the verdict, the court believes that the answer is in the affirmative. [That evidence includes the] nature of the information on the website; the perspective in the sense of position taken; the perspective

in the sense of literal viewpoint from which photographs were taken; the existence of animosity; the linkage between [John] Borg and the entity that registered the websites; the existence of address based registered webpages with the exception of the address of the plaintiffs; the self-professed technical and technological skill of [John] Borg with respect to Internet technology; the highly localized knowledge contained on some of the pages; all in the context of litigation started by the plaintiffs with the primary purpose of protecting the perceived interests of their daughter—the alleged 'target' of the improper conduct of the defendant.

"No other child or backyard was identified as being viewed in the manner in which there was claimed viewing of the plaintiffs' backyard. (Certainly there was no evidence of anyone else in the neighborhood complaining about the defendant's security cameras and what they might be capturing.) The plaintiffs made a point of their perceived need to shield their daughter from the defendant's cameras, and tried to portray their daughter as reluctant to be photographed because of the defendant's cameras.

"To be sure, John Borg testified to the contrary—he denied any involvement with the website, denied any continuing affiliation with the company to which the website was registered, and indeed went so far as to indicate that he had had a somewhat contentious if not adversarial relationship at times with that company, having had to purchase certain rights relating to websites that he did wish to control. The jury, however, was not obliged to accept his explanations, and again, the court is required to view the evidence in a light most favorable to sustaining the verdict, not undermining it." (Footnote omitted; internal quotation marks omitted.)

We agree with the court that, on the basis of the evidence at trial, the jury reasonably could have found in favor of the defendant on her claim alleging defamation against John Borg, as the evidence submitted in support of that claim was sufficient. The ample evidence linking John Borg to the creation and maintenance of the website, although circumstantial, was sufficient to permit the jury reasonably to infer that John Borg had registered the website domain name using a company credit card and that he posted the statements the jury determined to be defamatory. Accordingly, we conclude that the court did not err in refusing to set aside the verdict on the basis of insufficient evidence of defamation.

2

Invasion of Privacy

We next turn to the claim of false light invasion of privacy as to John Borg. To establish a false light invasion of privacy claim, the claimant must show that "the false light in which [she] was placed would be highly

offensive to a reasonable person, and . . . the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which [she] would be placed. . . . The essence of a false light privacy claim is that the matter published concerning the [claimant] (1) is not true . . . and (2) is such a major misrepresentation of [her] character, history, activities or beliefs that serious offense may reasonably be expected to be taken by a reasonable [person] in [her] position." (Citations omitted; internal quotation marks omitted.) *Goodrich* v. *Waterbury Republican-American, Inc.*, 188 Conn. 107, 131, 448 A.2d 1317 (1982).

The defendant's counterclaim for false light invasion of privacy hinges on many of the same facts and evidence relevant to the defamation claims, discussed in part I C 1 of this opinion. On the basis of that evidence, the jury reasonably could have concluded that the false light into which the defendant had been placed—as an alleged child pornographer—would be highly offensive to a reasonable person. In addition, the jury reasonably could have concluded that John Borg created and maintained the website with this accusation with knowledge that it was false for the purpose of antagonizing the defendant by misrepresenting her character in a major way. Accordingly, we conclude that the court did not abuse its discretion in refusing to set aside the verdict on the basis of insufficient evidence relating to the claim of false light invasion of privacy as to John Borg.

### 3

### Actual Malice

Finally, regarding the claim of insufficient evidence with respect to the jury's finding of actual malice, we conclude that the jury, having found that John Borg created the defamatory website posts in question, reasonably could have found that he exhibited actual malice in so doing. Our Supreme Court has defined actual malice as "the publication of a false statement with knowledge of its falsity or reckless disregard for its truth . . . ." *Gambardella* v. *Apple Health Care, Inc.*, 291 Conn. 620, 634, 969 A.2d 736 (2009). We agree with the trial court that the jury reasonably could have concluded, on the basis of the ongoing hostile relationship between the parties, the plaintiffs' refusal to discuss the defendant's concerns about the floodlights, and the police being called when the defendant put a letter in the plaintiffs' mailbox, that the website was nothing "[o]ther than . . . an attack on the defendant, in her role as adversary, [as] no other possible motivation [for creating the website] appears likely."

Because we agree with the court that, on the basis of all of the aforementioned evidence, a jury reasonably could conclude that John Borg acted with actual malice in publishing defamatory accusations about the defen-

dant on the website, we conclude that the court did not abuse its discretion in refusing to set aside the verdict as to the counterclaims against John Borg.

D

Double Damages Claim

The plaintiffs' final claim with regard to the motion to set aside the verdict is that the court erred in denying the motion because the jury's award of damages against both John Borg and Alison Borg constituted double damages. We agree with the plaintiffs that the jury awards of $250,000 as to both the defamation claim and the false light invasion of privacy claim brought against John Borg related to the website were duplicative. Accordingly, we conclude that the court abused its discretion in refusing to set aside the verdict on that basis.

"[A] plaintiff may be compensated only once for his just damages for the same injury. . . . Plaintiffs are not foreclosed from suing multiple defendants, either jointly or separately, for injuries for which each is liable, nor are they foreclosed from obtaining multiple judgments against joint tortfeasors. . . . This rule is based on the sound policy that seeks to ensure that parties will recover for their damages. . . . The possible rendition of multiple judgments does not, however, defeat the proposition that a litigant may recover just damages only once." (Citations omitted; footnotes omitted; internal quotation marks omitted.) *Gionfriddo* v. *Gartenhaus Cafe*, 211 Conn. 67, 71–72, 557 A.2d 540 (1989). "Duplicated recoveries . . . must not be awarded for the same underlying loss under different legal theories." (Internal quotation marks omitted.) *Kelly* v. *Kurtz*, 193 Conn. App. 507, 533, 219 A.3d 948 (2019).

In the present case, the plaintiffs claim that the defendant was awarded double damages when (1) John Borg was assessed $146,000 plus $295.60 for the private nuisance claim and $146,000 for the intrusion upon seclusion invasion of privacy claim, both stemming from the use of the floodlights, (2) John Borg was assessed $250,000 for the defamation claim and $250,000 for the false light invasion of privacy claim related to the website, and (3) Alison Borg was assessed almost the same noneconomic damages as John Borg ($146,000 plus $295.59 and $146,000, respectively) for the private nuisance and invasion of privacy claims relevant to the floodlight placement.[8]

In its memorandum of decision, the court stated as follows: "In the interrogatories, the court explicitly asked the jury to provide a net figure of damages as to each of the plaintiffs, allowing for any possible duplication. The jury indicated in its answers to the interrogatories that the $146,000 awarded as to each of two claims directed to each of the plaintiffs was intended to be cumulative, as to each plaintiff. As to John Borg, there was a similar indication with respect to the awards of

$250,000. Specifically, at the conclusion of the section of the interrogatories directed to John Borg, interrogatory [number] 53 asked: Adjusting for any overlap or duplication of damages with respect to the claims asserted by [the defendant] against John Borg that you find to have been proven (your responses to interrogatories #36, #39, #42, #46 and #51),[9] the total (net) compensatory damages she sustained as a result of the John Borg's wrongful conduct total . . . .

"The jury entered $792,305.60 as that net figure, in the space provided. That is the sum of the entries to the interrogatories listed in [interrogatory number] 53: $146,295.60 + $146,000 + $10 + $250,000 + $250,000 (again, the damages awarded for each of the five claims asserted against John Borg). There is a similar interrogatory and similar answer as to [Alison] Borg— $146,295.59 + $146,000 = $292,295.59. (Only the claims of private nuisance and invasion of privacy (seclusion) were submitted to the jury with respect to [Alison] Borg—therefore, only two damages award figures.) Therefore, there can be absolutely no question that the jury intended to award a total (net of any adjustment for duplication) of $292,000 in noneconomic damages as against each of the plaintiffs [on the two counts related to the floodlights—those of private nuisance and invasion of privacy (seclusion)].

"The plaintiffs did not ask the court to charge the jury in a manner suggesting that the awards for private nuisance and invasion of privacy (seclusion) were inherently duplicative such that there could only be a single recovery, and likewise there was no analogous request relating to defamation and invasion of privacy (false light). Further, the manner in which the jury determined its awards is beyond the scope of review by the court (so long as not affirmatively improper), the court cannot determine whether the jury determined each award separately and then determined that the aggregated figures was the total intended award, or determined an aggregate award that was then allocated across the claims. The treatment of economic damages, discussed immediately below, indicates that the jury was conscious of the need to allocate/award damages in a nonduplicative sense, and the court has no basis— other than in the context of remittitur—to conclude that there was duplication of the awards directed to either of the plaintiffs.

"The court recognizes that it failed to ask the jury to make a similar determination with respect to the awards against the two plaintiffs—was there duplication in the award of $292,000 against each of the plaintiffs for these two claims? On the one hand, the jury was aware of the court's concern about duplicative awards, but on the other hand, there was no explicit mechanism provided to the jury for indicating whether there was an intent to award $292,000 against each . . . plaintiff,

without any duplication, i.e., an intent to award aggregate damages [of] $584,000 as to those claims. . . .

"The court believes that it is compelled to conclude that the jury did, in fact, intend to award $292,000 in noneconomic damages as against each of the plaintiffs, for an aggregate award on the private nuisance and invasion of privacy (seclusion) of $584,000. Although it may seem to be a tail wagging the dog approach, it is the economic damages component of the award that convinces the court that it cannot treat those awards as duplicative. The claim for economic damages relating to these claims was $591.19. If the jury had awarded that amount as economic damages against each of the plaintiffs, that might have been persuasive evidence of duplication of the award as to noneconomic damages— duplication as to one readily could suggest duplication as to the other. If the economic damages claimed had been an even number, and the jury had awarded a figure that was half of that claimed amount against each plaintiff, there would be at least a theoretical possibility of duplication of an award of a reduced amount. But the jury was faced with an odd number for the economic damages, and awarded different amounts (by a penny) against the two plaintiffs such that the total added up to the aggregate claim of $591.19. The jury made sure that there was no duplication in the award of economic damages, and given that level of care with a less than $600 figure, the court cannot conclude that they were not as conscious of potential duplication of noneconomic damages. The jury clearly was looking at an aggregate award to the defendant consisting of the damages assessed against . . . John Borg added to the damages assessed against . . . Alison Borg. . . .

"The manner in which the jury reached its conclusions is unknown; it is clear, however, that the jury intended an aggregate damages award, on the claims of private nuisance and invasion of privacy (seclusion) in the amount of $584,591.19. This is not a case in which the jury was given multiple theories of liability and can be deemed to have awarded duplicative damages . . . ." (Footnote added; internal quotation marks omitted.)

On appeal, the plaintiffs claim that the damages are unsupported by the record and "amount to a wholesale windfall for the defendant," and argue that the damages are duplicative in nature. First, with regard to the damages assessed against John Borg and Alison Borg for each of the claims pertaining to the use of lights, the court, in its analysis, considered the fact that neither party objected to the jury charge as given, nor did the plaintiffs ask the court to charge the jury in a manner that would instruct it to consider the nuisance and invasion of privacy claims related to the floodlights as one claim for purposes of awarding damages. The court assessed the fact that the responses to the jury interrog-

atories asking for the total amount of damages awarded each with respect to John Borg and Alison Borg revealed that "there can be absolutely no question that the jury intended to award a total . . . of $292,000 in noneconomic damages as against each of the plaintiffs." In addition, the court weighed the fact that, in terms of economic damages, the jury did *not* award identical damages against each plaintiff and, instead, awarded them totals that differed by one penny. It was upon this observation that the court premised its conclusion that the jury knew that its award against each plaintiff *could* permissibly be different, which therefore implies that its award of identical amounts against each plaintiff was not a mistake but was intended to constitute separate, cumulative awards on the nuisance and invasion of privacy claims.

Giving, as we must, great deference to the court's decision to not set aside the verdict on the basis of double damages, and upon review of the court's inquiry into the nature of the jury's award, there is no sound basis on which to disturb the court's conclusion that the award of damages on the claims related to the lights as against each plaintiff was not duplicative.

With regard to the two claims against John Borg related to the website, however, we conclude that the court should have set aside the verdict awarding $250,000 to the defendant for each of those claims. Our Supreme Court has observed that "we join those jurisdictions that have allowed causes of action for invasion of privacy and defamation to be pleaded together. *Miller* v. *News Syndicate Co.*, 445 F.2d 356, 357 (2d Cir. 1971); *Varnish* v. *Best Medium Publishing Co.*, 405 F.2d 608 (2d Cir. 1968), cert. denied, 394 U.S. 987, 89 S. Ct. 1465, 22 L. Ed. 2d 762, reh. denied, 395 U.S. 930, 89 S. Ct. 1769, 23 L. Ed. 2d 251 (1969); *Rinsley* v. *Brandt*, 446 F. Supp. 850, 858 (D. Kan. 1977), and cases therein. This conclusion recognizes that each action protects different interests: privacy actions involve injuries to emotions and mental suffering, while defamation actions involve injury to reputation. [*Rinsley* v. *Brandt*, supra, 446 F. Supp. 858], quoting *Froelich* v. *Adair*, 213 Kan. 357, 516 P.2d 993 (1973). There can, of course, be only one recovery for any particular publication. *Dodrill* v. *Arkansas Democrat Co.*, 265 Ark. 628, 638, 590 S.W.2d 840 (1979), cert. denied, 444 U.S. 1076, 100 S. Ct. 1024, 62 L. Ed. 2d 759 (1980), citing 3 Restatement (Second), Torts § 652E, comment b, and 62 Am. Jur. 2d, Privacy § 5." *Goodrich* v. *Waterbury Republican-American, Inc.*, supra, 188 Conn. 128 n.19. Relying on this authority, we conclude that, to the extent that the trial court sanctioned this recovery with respect to these two counts, it instead should have granted the plaintiffs' motion to set aside the verdict.

Accordingly, we conclude that the jury awards of $292,000 against each plaintiff for the private nuisance

and intrusion upon seclusion invasion of privacy claims did not constitute duplicative damages. The jury awards of $250,000 as to both the defamation claim and the false light invasion of privacy claim brought against John Borg related to the website, however, were duplicative, and, accordingly, we conclude that the court abused its discretion in refusing to set aside the verdict on that basis.

## II

### AWARD OF PUNITIVE DAMAGES

The plaintiffs next claim that the court improperly awarded punitive damages to the defendant because (1) the court failed to conduct an evidentiary hearing to determine the amount of punitive damages, in the form of attorney's fees, to be ordered, and (2) the court should have submitted to the jury the issue of the amount of punitive damages to be awarded, rather than resolving that issue itself. Specifically, with regard to their first claim, the plaintiffs argue that the court abused its discretion in awarding punitive damages to the defendant in the absence of any bills or invoices produced by the defendant. Regarding their second claim, the plaintiffs argue that, pursuant to this court's holding in *Iino* v. *Spalter*, 192 Conn. App. 421, 218 A.3d 152 (2019), the court should have submitted to the jury the issue of the amount of punitive damages to be awarded. We disagree.

The following additional facts are relevant to our resolution of this claim. In the court's memorandum of decision on the motion to set the amount of punitive damages, the court stated that "[t]he parties, prior to submission of the case to the jury, had agreed that the jury would only determine whether any party had proved entitlement to punitive damages, with the actual determination of the amount of punitive damages to be addressed by the court."[10] At trial, without objection, the court instructed the jury in accordance with the agreed on bifurcation. The court stated: "If you conclude that any of the parties acted with reckless disregard for the rights of the adverse party with respect to invasion of privacy, trespass or private nuisance, you may award punitive or exemplary damages. Again, you only need to determine that a party is entitled to punitive damages. The court will do the actual calculation of the amount after your verdict is rendered." On March 2, 2018, after the court accepted the jury verdict in favor of the defendant, which included a determination that the defendant was entitled to punitive damages, the plaintiffs filed a motion to set aside the verdict. Also on March 2, 2018, the defendant filed a motion for the court to set the amount of punitive damages awarded to her on the basis of Alison Borg's recklessness and John Borg's actual malice, as found by the jury. In support of that motion, the defendant filed a sworn affidavit of her counsel asserting the total amount of

attorney's fees she had incurred from the date she filed her counterclaim as being $96,855.25. The defendant did not submit law firm invoices or time records. On May 9, 2018, by way of memorandum of decision, the court awarded the defendant $32,600 in punitive damages, approximately 30 percent of the requested total.

On appeal, the plaintiffs argue that (1) the court should have held an evidentiary hearing at which the defendant would be required to produce evidence of her incurred legal fees, and (2) the determination of the amount of punitive damages to be awarded should have been left to the jury.

We first set forth the relevant standard of review and the legal principles that inform our analysis. "In awarding punitive damages . . . [t]he trial court has broad discretion in determining whether damages are appropriate. . . . Its decision will not be disturbed on appeal absent a clear abuse of discretion." (Internal quotation marks omitted.) *Nelson* v. *Tradewind Aviation, LLC*, 155 Conn. App. 519, 542, 111 A.3d 887, cert. denied, 316 Conn. 918, 113 A.3d 1016 (2015).

First, in the absence of a request by the plaintiffs for an evidentiary hearing, we find unpersuasive the plaintiffs' argument that the court should have conducted an evidentiary hearing prior to determining the total amount of punitive damages to award the defendant. In addition to the broad discretion afforded to trial courts in determining issues of punitive damages, "[c]ourts may rely on their general knowledge of what has occurred at the proceedings before them to supply evidence in support of an award of attorney's fees. . . . The court [is] in a position to evaluate the complexity of the issues presented and the skill with which counsel had dealt with these issues." (Internal quotation marks omitted.) *Andrews* v. *Gorby*, 237 Conn. 12, 24, 675 A.2d 449 (1996).

In the present case, the court was presented with a sworn affidavit of the defendant's counsel, setting forth the total amount of legal fees incurred by the defendant. The plaintiffs do not appear to challenge the fees charged by counsel to defend against the complaint and to pursue the counterclaim. Rather, it appears that they did nothing more than argue that the court should award only 20 percent of the amount requested. They did not ask to examine the defendant's counsel and offered no affidavits or evidence of their own regarding the reasonableness of the fees claimed.

In addition, the court, *Povodator, J.*, had been involved with this case since the beginning and, therefore, was familiar with the claims and evidence involved. In its memorandum of decision, the court stated: "[T]he court has a singularly advantageous perspective . . . [in that] the undersigned has been involved with this case virtually from its inception

. . . . Absent the particularity required by case law as identified by the court, the court is limited in its ability to rely on its own experience and judgment in determining the proper attorney's fees. Recognizing that the plaintiffs' 20 [percent] estimate [as being an appropriate fee award] was (not surprisingly) unreasonably low, the court will round down its conservative to low estimate of one third, to 30 [percent]." (Footnote omitted.) The court, after considering the history of the case—with which it was familiar—and in recognition of the fact that it had only been presented with an affidavit and not with actual fee bills, rounded down its own estimate of what it deemed appropriate attorney's fees. Accordingly, we find the plaintiffs' argument that the court was required to hold an evidentiary hearing, sua sponte, on punitive damages unavailing, and the court was well within its broad discretion in awarding $32,600 in punitive damages to the defendant.

Next, with regard to the plaintiffs' argument that the amount of punitive damages should have been left for the jury—and not the court—to determine pursuant to *Iino* v. *Spalter*, supra, 192 Conn. App. 421, we again are unpersuaded.

In *Iino*, the defendant executrix of the decedent's estate appealed from the judgment of the trial court in favor of the plaintiff, who brought an action sounding in tort against the decedent's estate. Id., 424. The defendant claimed on appeal, inter alia, that the court improperly permitted the jury to find her liable for punitive damages without evidence as to the plaintiff's litigation expenses and that the court improperly reserved to itself the issue of the amount of punitive damages to be awarded. Id., 423. Prior to the plaintiff's presentation of evidence at trial, the defendant submitted a request to the court that the court submit any determination of punitive damage amounts to the jury. Id., 457. Following the plaintiff's failure to present any evidence of her legal fees as evidence, the defendant asked the court not to charge the jury on punitive damages because no such evidence had been presented but reiterated that, if the issue of liability for punitive damages were to go to the jury, the court must have the jury also determine the amount of those punitive damages. Id. The plaintiff agreed that the issue of punitive damages was a jury question but stated that the question of the amount of damages was for the court to determine. Id., 457–58. The trial court agreed with the plaintiff, and the defendant appealed to this court. Id., 458.

On appeal, this court, agreeing with the defendant, concluded that, "[b]ecause the defendant properly and timely requested that the question of the amount of punitive damages be decided by the jury, it was incumbent on the plaintiff to submit evidence supporting her claim to such damages in her case. It is undisputed that she did not do so. We conclude, on the basis of the

foregoing, that the court improperly charged the jury on punitive damages when there was no evidence of damages to support that charge." Id., 470.

*Iino*, along with the cases to which this court refers within that opinion, contemplates the absence of any agreement between the parties regarding a bifurcation of the issues of punitive damages liability and amount.[11] In the present case, unlike in *Iino*, the parties agreed prior to trial that the issues of liability and damages would be bifurcated between the jury and the court. Additionally, unlike in *Iino*, the plaintiffs here raised no objection to the court's instruction to the jury that the court would determine the amount of punitive damages to be awarded, if applicable.

In the present appeal, the plaintiffs do not challenge the court's observation, as set forth in its memorandum of decision, that the parties had agreed to submit the issue of the amount of punitive damages, if any, to the court, and not the jury. The plaintiffs' failure to object to the court's instruction to the jury that it was to consider solely the issue of whether punitive damages should be awarded, but not the amount of such damages, is consistent with the court's observation. "Our rules of practice require a party, as a prerequisite to appellate review, to distinctly raise its claim before the trial court. . . . For that reason, we repeatedly have held that we will not decide an issue that was not presented to the trial court. To review claims articulated for the first time on appeal and not raised before the trial court would be nothing more than a trial by ambuscade of the trial judge." (Citations omitted; internal quotation marks omitted.) *Dziedzic* v. *Pine Island Marina, LLC*, 143 Conn. App. 644, 654–55, 72 A.3d 406 (2013). Accordingly, the plaintiffs cannot be heard to complain on appeal that the court's bifurcation of the punitive damages determination, with which they agreed at the time of trial, entitles them to relief. To review this aspect of the present claim would amount to an ambuscade of the trial court.

III

PERMANENT INJUNCTIVE RELIEF

The plaintiffs next claim that the court wrongly issued permanent injunctive relief because the defendant failed to sustain her burden of proving an absence of an adequate remedy at law.[12] More specifically, they claim that the defendant received an adequate remedy at law when she received a sizeable damages award from the jury and that the court "abused its discretion on the facts and erred on the law" in granting the defendant's request for an injunction.[13] The defendant argues that, "[d]espite the jury's finding in favor of [the defendant on her] counterclaim against the plaintiffs . . . and . . . awarding a significant amount of damages, the website remained up, thus denying [the defendant]

the justice and peace that the trial should have afforded her," and, accordingly, the monetary remedy was not adequate. We agree with the defendant.

We begin by setting forth the relevant standard of review. "A party seeking injunctive relief has the burden of alleging and proving irreparable harm and lack of an adequate remedy at law. . . . A prayer for injunctive relief is addressed to the sound discretion of the court and the court's ruling can be reviewed only for the purpose of determining whether the decision was based on an erroneous statement of law or an abuse of discretion. . . . Therefore, unless the trial court has abused its discretion . . . the trial court's decision must stand." (Internal quotation marks omitted.) *Commissioner of Correction* v. *Coleman*, 303 Conn. 800, 810, 38 A.3d 84 (2012), cert. denied sub nom. *Coleman* v. *Arnone*, 568 U.S. 1235, 133 S. Ct. 1593, 185 L. Ed. 2d 589 (2013). "How a court balances the equities is discretionary but if, in balancing those equities, a trial court draws conclusions of law, our review is plenary." (Internal quotation marks omitted.) *Morton* v. *Syriac*, 196 Conn. App. 183, 191, 229 A.3d 1129, cert. denied, 335 Conn. 915, 229 A.3d 1045 (2020).

The following additional facts and procedural history are relevant to our resolution of this claim. The court scheduled an evidentiary hearing on the motion to modify the permanent injunction on May 18, 2018, which was continued to June 28, 2018, following John Borg's motion for a continuance. The hearing occurred as scheduled, and, on August 23, 2018, the court granted the defendant's request for a permanent injunction.

In its memorandum of decision ordering the permanent injunction, the court stated, with respect to the website: "The issue of irreparable harm is relatively straightforward. The jury concluded that the website is under the control of John Borg. The website associated the defendant with child pornography. There is continuing harm and there is no benefit to anyone from the continued existence of that particular aspect of the website and no cognizable harm if that particular page were to be deleted or edited so as to remove the association of the defendant with child pornography.

"[John Borg], while not acknowledging any involvement with that particular website or page, has often alluded to the ability of the defendant to contact the host of the website, asking/demanding that the page be taken down, or otherwise indicating that there is some level of self-help available. The problem is that the 'remedy' available is neither simple nor assured. [John Borg] is asking the defendant to identify the proper entity hosting the website and then contact that host—effectively asking for its assistance. The efficacy of this approach depends on proper identification of the host and determining the proper means of requesting that the page be taken down—and if that is done correctly,

ultimately depending on the willingness of the host to take the offending page down, notwithstanding the presumed absence of a corresponding request from its client/customer. Against the uncertainty of an ability to ensure relief through her own efforts, the party responsible for the existence of the offending webpage can direct removal of the offending page without any apparent uncertainty attributable to intervening steps and intervening actors (who must be convinced to act, presumptively against the wishes of a client). In this context, the ability to ask someone to provide relief—asking as a stranger, with no clear right to relief—is not perceived to be an adequate remedy at law. Conversely, even if the page were to be taken down by the hopefully correctly identified (and compliant) host, in the absence of any mandate directed to [John Borg], there would be nothing preventing him from using a different host or different website (or both) to repost the same offensive message. Given the jury determination of malice and entitlement to punitive damages, such a concern must be treated as more than hypothetical or speculative. Accordingly, the court has determined that the equities clearly warrant injunctive relief directed to . . . John Borg and that there is no adequate remedy at law.''

Our examination of the record and briefs and our consideration of the arguments of the parties persuades us that the trial court correctly determined that a permanent injunction was warranted. Because the quoted portion of the court's memorandum of decision fully addresses the plaintiffs' claim on appeal, we adopt it as the proper statement of the facts and applicable law on this issue. It would serve no useful purpose to repeat the discussion contained therein. See *Morton* v. *Syriac*, supra, 196 Conn. App. 198.

IV

MOTION FOR CONTEMPT

Finally, the plaintiffs claim that the court erred in granting the defendant's motion for contempt against John Borg pertaining to his alleged failure to comply with the court's order; see footnote 13 of this opinion; requiring that he take down the website containing defamatory statements about the defendant. We disagree.

We begin our analysis by setting forth the relevant standard of review. "[O]ur analysis of a judgment of contempt consists of two levels of inquiry. First, we must resolve the threshold question of whether the underlying order constituted a court order that was sufficiently clear and unambiguous so as to support a judgment of contempt. . . . This is a legal inquiry subject to de novo review. . . . Second, if we conclude that the underlying court order was sufficiently clear and unambiguous, we must then determine whether the trial court abused its discretion in issuing, or refusing

to issue, a judgment of contempt, which includes a review of the trial court's determination of whether the violation was wilful or excused by a good faith dispute or misunderstanding. . . . [A] person must not be found in contempt of a court order when ambiguity either renders compliance with the order impossible, because it is not clear enough to put a reasonable person on notice of what is required for compliance, or makes the order susceptible to a court's arbitrary interpretation of whether a party is in compliance with the order.'' (Citation omitted; internal quotation marks omitted.) *Bruno* v. *Bruno*, 177 Conn. App. 599, 620, 176 A.3d 104 (2017).

The following facts are relevant to this claim. On August 23, 2018, as discussed in part III of this opinion, the court issued a permanent injunction order requiring John Borg, inter alia, "to remove, or take steps to ensure removal of, the webpage on battleofcompohill.com containing the reference to the defendant as being associated with child pornography, either by deleting the page or removing all references to child pornography and 'watching' children . . . .'' The court issued this order despite John Borg's continued denial of having access to or the ability to remove the website because he claimed to have no involvement in its creation or maintenance. In issuing its order, the court explained that "[t]he court recognizes that John Borg has denied and apparently has continued to deny any ability or authority to take or effectuate any such corrective action, but in light of the jury determination and the court's own assessment of the evidence for purposes of this equitable phase of the proceedings, the court is not constrained by such persistent denials (recognizing that any enforcement/contempt proceeding might require a more intensive examination of the existence or absence of ability to comply).''

On October 12, 2018, the defendant filed a motion for contempt claiming, inter alia, that John Borg had failed to comply with the court's order because the website was still up and accessible. Following hearings on the motion for contempt, the court, on March 12, 2019, issued a written order in which it granted the defendant's motion.[14]

We first assess, whether the court's order was sufficiently clear and unambiguous as to put John Borg on notice of what was required for compliance. For purposes of analysis, we restate the relevant language of the order: "The plaintiff John Borg is ordered to remove, or take steps to ensure removal of, the webpage on battleofcompohill.com containing the reference to the defendant as being associated with child pornography, either by deleting the page or removing all references to child pornography and 'watching' children . . . it being the intent of the court that John Borg take all steps and measures reasonably within his power to

remove the offending page, including but not limited to rights he has or may have as the nominal owner of the website or person in control of the entity-owner of the website or person acting as liaison with the host on behalf of the owner or in any way having any involvement or control over the content of the website. [John Borg] is ordered to comply no later than three weeks after issuance of this order." Upon our review of the permanent injunction order, we see no way in which the text of the order could be construed as being unclear or ambiguous and, accordingly, agree with the court that the order was sufficiently clear and unambiguous as to support a finding of contempt.

Having determined that the order was clear and unambiguous, we next must determine, as the plaintiffs argue on appeal, whether the trial court abused its discretion in holding John Borg in contempt. The plaintiffs argue that he did not wilfully defy the order because "[he] does not own the site . . . control the site . . . [or] know who owns or controls or runs the site . . . [and] [b]y definition, the only thing he *could* do was to contact the domain registrant to request that the site be taken down, which he did." (Emphasis in original.) Specifically, they argue that the trial court, in its memorandum of decision on the motion for contempt, noted that an inability to comply would not render him wilfully noncompliant. The plaintiffs' argument is belied by the following text of the memorandum of decision: "The inability to comply with an order is a defense to contempt, but the burden is on the alleged contemnor to prove that defense. . . . The burden of proving a defense of inability to comply with the order is on . . . John Borg, and he is saddled with a substantial credibility gap, with his lack of credibility substantially self-inflicted." Concluding that John Borg had failed to satisfy his burden of establishing the affirmative defense of inability to comply, the court—relying on the "presumed existence of harm arising from the continuing presence of the defamatory webpage"—imposed a fine of $50 per day until the webpage was removed, finding John Borg in contempt for failing to comply with the permanent injunction order.

The record is clear that John Borg was ordered to take down the website or, at least, attempt to mitigate the damage it had continued to cause the defendant. The record is also unequivocally clear that John Borg had not done so, and the court acted well within its discretion in finding that John Borg has failed to prove that his failure to comply was anything but wilful. Accordingly, we reject the plaintiffs' claim.

The judgment is reversed in part and the case is remanded with direction to vacate either the award of $250,000 in favor of the defendant on the defamation count or the award of $250,000 in favor of the defendant on the false light invasion of privacy count; the judg-

ment is affirmed in all other respects.

In this opinion the other judges concurred.

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

[1] In addition to John Borg and Alison Borg, who are married, their minor daughter also is a plaintiff. The causes of action brought by the plaintiffs, however, are not before the court at this time. Rather, we are concerned only with the counterclaim brought by the defendant. All references to the plaintiffs, except where specifically noted, refer to John Borg and Alison Borg.

[2] Although defamation and defamation per se were pleaded as separate counts within the defendant's counterclaim, it appears that, based on the jury interrogatories, the jury was asked to award damages only for defamation generally. There is no claim on appeal that jury should have entered a separate award in accordance with its determination that John Borg's defamatory statement about the defendant on the website was defamatory per se.

[3] The plaintiffs appeal from only the court's ruling on their motion to set aside the verdict in favor of the defendant on her counterclaim, as they did not file a motion to set aside the verdict with regard to their complaint.

[4] The court, in its memorandum of decision on the motion to set aside the verdict, referred to "this dispute" because "there had been a prior dispute that forms part of the history of the relationship between the parties. Shortly after the plaintiffs began to occupy their property, they learned that the then existing right-of-way (supposedly centered on the boundary between their respective properties) was improperly located, encroaching on the property occupied by the plaintiffs rather than straddling the property line as indicated by the appropriate deeds. One of the other residents in the area, whose property abutted the right-of-way and also was affected by this potential or actual problem, commenced litigation relating to the state of title and location of the right-of-way, resulting in an eventual settlement whereby the right-of-way was relocated closer to, if not exactly in, the deeded location. This required the defendant, and other property owners on her side of the right-of-way, to recognize that their backyards were not as large as had been believed, and required in some instances the relocation of fences (including the defendant's).

"The relevance of the prior litigation is that it likely created or exacerbated bad feelings on the part of at least some of the neighbors as related to the plaintiffs, and may have contributed to a defensive if not metaphorically paranoid attitude on the part of the plaintiffs (a sense that the neighbors did not like them or resented them). The earlier litigation, *Fellows* v. *Schor*, [Superior Court, judicial district of Fairfield, Docket No.] CV-14-6039942-S, was commenced with a return date in January, 2014, and was effectively settled in June–July, 2015 (judgment of dismissal entered on July 31, 2015). This action was commenced less than a year later, with a return date of May 17, 2016."

[5] At trial, the defendant testified regarding these statements on the website, indicating that she had no knowledge of any such case against her and stating that she found these accusations to be upsetting.

[6] In its memorandum of decision, by which the court ordered the remittitur of $292,000, the court stated: "[T]he court orders a remittitur of $292,000, but does so by ordering that the awards of $292,000 against each of the plaintiffs for noneconomic damages related to the private nuisance and invasion of privacy (seclusion) be treated as joint and several, thereby limiting the recovery for noneconomic damages related to private nuisance and invasion of privacy (seclusion) to an aggregate amount of $292,000 without impinging on the jury's determination that each plaintiff is or should be liable for (or up to) that amount."

[7] Following the dismissal of the juror in question, the court instructed the jury to begin its deliberations anew with the alternate juror who had been chosen as a replacement.

[8] Although the court determined that the damages awarded to the defendant were not duplicative in any of the ways asserted by the plaintiffs, the court ultimately granted the plaintiffs' motion for remittitur on other grounds. The court issued a remittitur in the amount of $292,000, leaving the plaintiffs jointly and severally liable for the remaining $292,000 on the nuisance and invasion of privacy (seclusion) claims. See footnote 6 of this opinion.

[9] Interrogatories numbers 36, 39, 42, 46 and 51 are the interrogatories asking for the determination of damages, as to each of the five claims

asserted against John Borg.

[10] During a colloquy outside the presence of the jury, the court explained its proposed jury instructions to counsel and provided the parties with an opportunity to object. Specifically, the court stated: "What I . . . did is, if you look at the verdict forms, I've also added a place . . . for . . . entitle[-ment] to punitive damages. So, it's clear on the verdict form. My assumption is nobody has said anything to the contrary, nobody has offered any proof, so it's . . . I think we have that as a default that it's quite common, probably most common, that the jury simply says, yea or nay on the punitive damages, and we would deal with that after the verdict. Nobody has said anything to the contrary. Nobody has offered any evidence to the contrary. So, I'm not sure how we can have any awards of punitive damages, except on that basis. So, I'm assuming that that's what you're doing and if anybody wants to say anything to the contrary in a couple of minutes, you'll have your opportunity to tell me where I've gone astray on any of the things I've commented on."

When provided with the opportunity to take issue with any of the court's proposed instructions, counsel for the plaintiffs indicated that he did not have any objections.

[11] In *Iino*, this court discusses the federal case of *Wolf* v. *Yamin*, 295 F.3d 303, 312 (2d. Cir 2002), and states the question certified to our Supreme Court in that case as follows: "[U]nder Connecticut law on punitive damages, is a plaintiff who does not offer any evidence of litigation costs at trial before a jury barred from recovering any punitive damages? (*This question assumes there has been no agreement by the parties to a bifurcation of the punitive damages determination between the jury/trier of fact as to liability and the judge as to amount.*)" (Emphasis altered; internal quotation marks omitted.) *Iino* v. *Spalter*, supra, 192 Conn. App. 460.

[12] The permanent injunction ordered by the court pertained to both the plaintiffs' use of the lights on their property, as well as to the defamatory website connected to John Borg. More specifically, the permanent injunction limited the plaintiffs' use of the lights directed at the defendant's property and required John Borg to remove the defamatory statements about the defendant from the website. On appeal, the plaintiffs do not challenge the permanent injunction limiting their use of the lights, and, accordingly, we address only the court's order to the extent that it pertains to the website.

[13] The permanent injunction order states in relevant part: "John Borg is ordered to remove, or take steps to ensure removal of, the webpage on battleofcompohill.com containing the reference to the defendant as being associated with child pornography, either by deleting the page or removing all references to child pornography and 'watching' children . . . it being the intent of the court that John Borg take all steps and measures reasonably within his power to remove the offending page, including but not limited to rights he has or may have as the nominal owner of the website or person in control of the entity-owner of the website or person acting as liaison with the host on behalf of the owner or in any way having any involvement or control over the content of the website. [John Borg] is ordered to comply no later than three weeks after issuance of this order."

[14] Although John Borg was found in contempt of the court's permanent injunction order with respect to both the operation of lights on the plaintiffs' property and his connection to the website containing defamatory statements about the defendant, the plaintiffs challenge only the contempt ruling in connection with the website, and not the contempt ruling regarding the lights. Accordingly, we address only the former.

———————————————